42.     Attending a conference in London during the last week of June 2007, O'Neal stated that problems in the subprime area were "reasonably well contained." O'Neal added that, "There have been no clear signs it's spilling over into other subsets of the bond market, the fix-income market and the credit market."

43.     On July 17, 2007, Merrill Lynch announced its financial results for the second quarter of 2007, in a release which stated in part:

> Merrill Lynch today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.
>
> Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pretax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.
>
> Second-quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior-year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.
>
> "We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive

officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 percent from the prior-year period, while net earnings were up 31 percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review**:

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first-half 2006 results in the following discussion of business segment results exclude the impact of these one-time expenses.

\*     \*     \*

**Merrill Lynch Investment Managers (MLIM)**
On September 29, 2006, Merrill Lynch merged MLIM with BlackRock in exchange for a total of 65 million common and preferred shares representing an economic interest of approximately half of the newly combined BlackRock. Following the merger, the MLIM business segment ceased to exist, and under the equity method of accounting, an estimate of the net earnings associated with Merrill Lynch's ownership position in BlackRock is recorded in the GIM portion of the GWM

segment. For the second quarter of 2006, MLIM's net revenues were $630 million, and its pretax earnings were $240 million. For the first six months of 2006, MLIM's net revenues were $1.2 billion and its pretax earnings were $462 million.

*    *    *

**Income Taxes**

Merrill Lynch's second-quarter effective tax rate was 29.2 percent, compared with 30.5 percent for the second quarter of 2006. The effective tax rate for the first six months of 2007 was 29.8 percent, compared with 28.3 percent in the prior-year period, or 30.1 percent excluding the one-time compensation expenses.

**Share Repurchases**

As part of its active management of equity capital, Merrill Lynch repurchased 19.8 million shares of its common stock for $1.8 billion during the second quarter of 2007, completing the $5 billion repurchase program authorized in October 2006 and utilizing $557 million of the $6 billion repurchase program authorized in April 2007.

44.    The true facts, which were known by the Officer and Director Defendants but concealed from the investing public were as follows:

(a)    The Company was more exposed to CDOs containing subprime debt than it disclosed; and

(b)    The Company's Class Period statements were materially false due to their failure to inform the market of the extent of likely write downs in the Company's CDO portfolio due to the deteriorating subprime mortgage market which caused Merrill's portfolio to be impaired.

**Merrill Lynch is Forced to Write Down Over $8 Billion in Bad Debt**

45.    On October 5, 2007, Merrill Lynch announced that it would be writing down the value of its CDOs by $4.5 billion.  Merrill Lynch further estimated that it would lose as much as 50 cents per share.  The comment shocked analysts who had been expecting a profit of around $2 a share.

46.    Then, just three weeks later, on October 24, Merrill Lynch admitted that its losses would actually total $7.9 billion.  In addition to a $463 million write down on leverage-buyout commitments, Merrill Lynch's total write downs for 2007's third fiscal quarter were over $8.3 billion.  The Company also announced a loss of $2.2 billion, or $2.85 a share, for the quarter – nearly six times the size of the loss Merrill Lynch had predicted just three weeks earlier.   Shares of Merrill Lynch fell $3.80, or 5.7%, to $63.32 following this announcement.

47.    During a conference call on October 24, O'Neal admitted that risk management had failed the firm, and that errors in judgment had allowed Merrill to amass an untenable $32 billion position in CDOs.  According to O'Neal, "We made a mistake." "Some errors in judgment were made in the business itself and within the risk management function." O'Neal also warned that further write downs were a possibility. Indeed, some analysts estimate the Company might have to write down those assets anywhere from $4 billion to $5 billion in the fiscal fourth quarter.

48.    As a result of this massive write off, Moody's Investor Service and other agencies have downgraded the firm's credit and debt ratings.

**It Takes an Egregious Act of Hubris by O'Neal Before the Board Decides to Show him the Door**

49.     By any measure, O'Neal's tenure at Merrill Lynch was rocky at best.  Since becoming chief executive in late 2002, Merrill Lynch's shares had an annual return of about 7 percent before dividends, compared with returns of 11 percent for Morgan Stanley and 24 percent for Goldman Sachs.  Indeed, at the end of 2007's fiscal third quarter, Merrill Lynch's earnings per share were down 241% from the year before and the share price was down 34% from just a few months earlier in June 2007.  These returns were far and away worse than those of any of Merrill Lynch's competitors.

50.     Incredibly, Merrill Lynch's flat performance and $8.3 billion in write downs were not, by themselves, enough for the Director Defendants to fire O'Neal.  Rather, O'Neal had to attempt to accomplish a staggering breach of loyalty before he was shown the door.

51.     Specifically, on October 26, the *New York Times* reported that O'Neal had contacted one of Merrill Lynch's competitors, Wachovia Bank, about a potential merger.  He did so without informing Merrill Lynch's board or obtaining its permission.  Why did O'Neal makes such an overture to Wachovia?  It wasn't because he thought it would be in the best interests of the Company.  Rather, O'Neal stood to make $250 million in severance pay if there was a change in control of the Company.

52.     Upon publication of the *New York Times* article, rumors quickly spread that the board was incensed by his actions and that O'Neal was on his way out.  Sure enough, just a few days later, on October 30, Merrill Lynch announced that O'Neal had retired, effective

immediately.  Unbelievably, the Director Defendants gave O'Neal a severance package worth more than $160 million as a parting gift.

## DEMAND FUTILITY

53.     Plaintiff brings this action derivatively in the right and for the benefit of Merrill Lynch to redress damage suffered and to be suffered by Merrill Lynch as a direct result of Defendants' breaches of fiduciary duty, corporate mismanagement, and abuse of control. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have.  Plaintiff will adequately and fairly represent the interests of Merrill Lynch and its shareholders in enforcing and prosecuting their rights.

54.     Plaintiff has not made any demand on the present board of Directors of Merrill Lynch to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

### A Majority of the Board Faces a Substantial Threat of Liability

55.     Merrill Lynch's current board is made of up 11 directors.  A majority of these those directors, if not all, face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand.  As detailed by *Forbes.com*:

> Although it is O'Neal who is being held accountable, the board bears a fair measure of blame as well for not catching on to the firm's mushrooming exposure to potentially risky derivatives – amounting to $32 billion at the end of June just before the market started to crater.

56.     Defendants Jonas, Prueher, Reese, and Rossotti, are on Merrill Lynch's audit committee.  The audit committee's role is one of oversight.  It is responsible for ensuring the integrity of Merrill Lynch's financial statements.  The audit committee completely failed to

fulfill its oversight role by allowing Merrill Lynch to file financial statements with the SEC that, as discussed above, did not accurately describe the risks the Company faced as a result of its over exposure to CDOs and subprime loans. As such, each of these defendants cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

57.    Defendants Cribiore, Finnegan, Reese and Rossotti are on Merrill Lynch's finance committee. Defendant Finnegan is the committee's chair. Amongst other things, the audit committee is responsible for overseeing Merrill Lynch's credit and market risk management. By allowing Merrill Lynch to take on billions of dollars in CDO debt -- most of which has already been written down or will be written down in the near future – the finance committee completely failed to fulfill its oversight responsibilities. As such, each of these defendants cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

58.    On information and belief, each of the Director Defendants approved an authorized O'Neal's severance package, which is valued at more than $160 million. In doing so, each of the Director Defendants wasted the Company's assets in that the severance package was exorbitant given the circumstances and given without consideration since the Company could have, and should have, terminated O'Neal's employment for cause. As such, each Director Defendant faces a substantial threat of personal liability for this reason as well.